UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
MERL DANIELS,                                   :
                                                :
                           Plaintiff,           :
                                                :        02 Civ. 6054 (HB)
            - against -                         :
                                                :        <u>OPINION & ORDER</u>
HEALTH INSURANCE PLAN OF GREATER NEW            :
YORK, AIDA PAGAN, and LOCAL 153, THE            :
OFFICE AND PROFESSIONAL EMPLOYEES               :
INTERNATIONAL UNION AFL-CIO,                    :
                                                :
                           Defendants.          :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

On July 30, 2002, Merl Daniels, ("Daniels" or "Plaintiff") filed a complaint against her former employer Health Insurance Plan of Greater New York ("HIP"), three HIP employees, Diane McGuire ("McGuire"), Artistine Terrell ("Terrell"), and Yolanda Jimenez ("Jimenez") (collectively "HIP Defendants"), Local 153, Local 153 representative Aida Pagan ("Pagan"), and the Office and Professional Employees International Union AFL-CIO ("OPEIU") (collectively "Union Defendants"), that alleged race, national origin discrimination, and hostile work environment claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, as well as failure to accommodate her disability pursuant to the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* Plaintiff also brings a 42 U.S.C. § 1983 claim as well as a claim for intentional infliction of emotional distress against all Defendants and a failure to represent claim against the Union Defendants. The case was assigned to Chief Judge Michael Mukasey and upon his departure, reassigned to me.

On November 12, 2004, HIP moved to dismiss the intentional infliction of emotional distress and the 42 U.S.C. § 1983 claims brought against it. McGuire, Terrell, and Jimenez also moved to dismiss all claims alleged against them. Chief Judge Mukasey granted the motion in its entirety. <u>Daniels v. HIP</u>, 2005 WL 1138492 (S.D.N.Y. May 12, 2005). As a result, no claims remain against the individual defendants and only the Title VII and ADA claims remain against HIP. The Union Defendants did not join the motion to dismiss thus the Title VII, 42 U.S.C. § 1983, intentional infliction of emotional distress and failure to represent claims remain.

1

HIP and the Union Defendants have now moved for summary judgment with respect to the remaining claims. For the reasons stated below, the summary judgment motion is GRANTED as to all defendants.

## I.   BACKGROUND

The facts stated below are undisputed, unless stated otherwise. On or about September 10, 1990, Merl Daniels, an African-American female, was hired as a secretary in HIP's Marketing Department. Merl Daniels Affidavit ("Daniels Aff.") ¶ 2. In that role, her duties include typing, filing, answering telephones and other administrative tasks for the sales representatives in the Marketing Department. Declaration of Artistine Terrell in Support of Def. HIP's Mot. for Summ. J. ("Terrell Decl."), Ex. 1, Daniels' Job Description. As a clerical employee, Daniels was a member of the Office and Professional Employees International Union, Local 153 ("Union") and subject to the Collective Bargaining Agreement between the Union and HIP that governed, among other things, promotions, vacations, sick leave, and salary. Declaration of Diane McGuire in Support of Def. HIP's Mot. for Summ. J. ("McGuire Decl."), Ex. 1.

*1. Daniels' Employment at HIP*

During the course of her employment, Daniels reported to two administrative managers. The first, Artistine Terrell ("Terrell"), an African-American female, supervised Daniels from 1990 through 2000. Terrell Decl. ¶ 3. From May 2000 until Daniels' termination in 2002, she reported to Yolanda Jimenez ("Jimenez"), a Hispanic female. Yolanda Jimenez Declaration ("Jimenez Decl.") at ¶ 3. Daniels alleges that these supervisors continuously harassed her by assigning her a disproportionately heavy workload and failing to accommodate her disability[1] despite her request that they do so. In addition, Daniels reports that she overheard Jimenez refer to her as a "nigger" on two different occasions.

Further, Daniels claims that while she requested and was denied a promotion in 1998, her Hispanic co-workers received favorable treatment and were promoted ahead of her despite their fewer years of service. Daniels reports that Pagan, one of her union representatives, failed to act in good faith and fairly represent her, despite her knowledge of the harassment and discrimination to which Plaintiff was allegedly subjected.

---

[1] Plaintiff alleges that she has a herniated disc in her lower back and neck, as well as carpal tunnel syndrome. Daniels Aff. ¶ 4.

HIP counters that Daniels was an insubordinate and disruptive employee, specifically towards supervisor Jimenez. The Plaintiff was unable to complete work assignments in a timely fashion and was eventually terminated for cause. Although Plaintiff disputes these reports of insubordination on the basis that "no documentary proof has been provided," unfortunately for Plaintiff, this is simply untrue. Jimenez recounts in her declaration four instances – on or about September 26, 2000, April 2, 2001, July 17, 2001, and February 6, 2002 – when Daniels was uncooperative and insubordinate. Jimenez Decl. ¶ 9, 11, 15, 16. Verbal counseling meetings followed these incidents where Daniels was warned that "[i]nsubordination is grounds for immediate dismissal," see, e.g., id., Ex. 1, Memo from Yolanda Jimenez to Merl Daniels (Sept. 26, 2000), and each meeting was memorialized in a memo to the Plaintiff, with a copy sent to Plaintiff's file. Id., Exs. 1-4.

Immediately following the February 6, 2002 incident, Daniels was given a formal warning at a meeting attended by Daniels, Jimenez, Mercedes Veras ("Veras"), one of Daniels' union representatives, and Diane McGuire ("McGuire"), Assistant Director of Human Resources. Daniels was again informed that her "inappropriate behavior will not be tolerated, and any recurrence will result in further disciplinary action up to and including termination of your employment with HIP Health Plan of New York." Id., Ex. 4, Memo from Yolanda Jimenez to Merl Daniels (Feb. 7, 2002).

On April 11, 2001, at Daniels' behest, the Union set up a grievance meeting where Daniels, Jimenez, Veras, McGuire, Pagan, and Allyson Zahl, a Human Resources employee, were in attendance. McGuire Decl. ¶ 12. At the meeting, Daniels' recounted her complaints and received HIP forms whereby she could request an accommodation due to her physical limitations, which she filled out following the meeting. Id., Ex. 10. HIP claims that this is the first time Daniels requested accommodation for her physical ailments. Id. ¶ 14.

Daniels was suspended on or about April 18, 2002 when a HIP employee reported that Daniels had threatened to physically harm Jimenez. Id. ¶ 18. After an internal investigation substantiated the allegations in the report, Daniels was fired from HIP on April 22, 2002. Id., Ex. 13. HIP's Workplace policy, a copy of which was provided to every employee, explains that a legitimate threat to a co-worker is grounds for termination of employment. Id., Ex. 12 at 5.

*2. Daniels' Discrimination Complaints*

On April 4, 2001, Daniels filed a complaint with the New York State Division of Human

Rights ("NYSDHR") that alleged that HIP discriminated against her on the basis of race, national origin, and disability. McGuire Decl., Ex. 6. She amended this complaint in July 2001 to add a harassment and failure to promote claim, id., Ex. 7, and again in April 2002 to add age discrimination and emotional distress claims. Id., Ex. 9. In the interim, during her amendments to the first complaint, she filed a second complaint with the NYSDHR in March 2002 that alleged harassment based on HIP's failure to accommodate her disability. Id., Ex. 8. Upon Plaintiff's request, both complaints pending before the NYSDHR were forwarded to the Equal Employment Opportunity Commission ("EEOC"). After receipt of a right to sue letter from the EEOC on July 5, 2002, her *pro se* complaint was filed with this Court on July 30, 2002. Declaration of Seema Misra in Support of Def. HIP's Mot. for Summ. J. ("Misra Decl."), Ex. 4. The complaint was amended in September 2004 when Daniels retained counsel. Id., Ex. 1.

Even now, the complaint is far from crystal clear and I have done my best to tie the conduct complained of to the race, national origin, and disability claims made to the EEOC, the agency which saw Plaintiff last. It appears that Daniels claims she suffered while employed in a hostile work environment and that the hostile work environment was prompted by race, national origin, and disability discrimination. She was yelled at by her Hispanic supervisor and assigned a heavier workload than her Hispanic co-workers, despite providing HIP with a doctor's note that stated she was unable to engage in heavy lifting due to the herniated discs in her neck and back. In fact, Daniels claims that HIP failed to accommodate her disabilities in violation of the ADA. In addition, Daniels alleges that Hispanic workers were promoted over her, again as the result of race and national origin discrimination. Further, it appears she claims the Union Defendants – Local 153, OPEIU, and union representative Pagan – failed to adequately represent her again due to her race, national origin, and because she suffered from a disability. These activities culminated in Daniels' alleged wrongful termination from HIP accomplished, according to the Plaintiff, on the same improper basis – race, national origin, and disability discrimination on the part of her employer.

## II.   STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, the movant on a motion for summary judgment must establish that there is no genuine issue of material fact and that the undisputed facts are sufficient to warrant judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250 (1986). The party

opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  A disputed issue of material fact alone is insufficient to deny a motion for summary judgment, the disputed issue must be "material to the outcome of the litigation," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); See also Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.").  In ruling on a summary judgment motion, the Court resolves all ambiguities and draws all inferences against the moving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (*per curiam*); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987).

It is well-known that in employment discrimination cases, where it is necessary to explore an employer's intent and motivation, summary judgment may not be appropriate.  See Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir. 1984).  Consequently, affidavits and deposition testimony must be scrutinized for circumstantial evidence, which if believed, would support a finding of discrimination.  Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).  That fact notwithstanding, Plaintiff must still produce sufficient evidence in support of her claim, so that a rational juror could find in her favor.  See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases.").

### III.   DISCUSSION

*A. Hostile Work Environment*

Plaintiff alleges that she was harassed by HIP employees as a result of her race, national origin, and disability.  To state a claim for hostile work environment, the plaintiff must allege that her work environment was abusive.  Harris v. Forklift, 510 U.S. 17, 22 (1973).  Specifically, plaintiff must show that she is 1) a member of a protected class, 2) suffered unwelcome harassment, 3) was harassed because of her membership in a protected class, and 4) the harassment was sufficiently severe or pervasive to alter conditions of her employment and create

an abusive work environment.  Meritor Sav. Bank FSB v. Vinson, 477 U.S. 57, 65 (1986).  The court looks at the totality of the circumstances to determine harassment – the frequency and severity of the conduct, whether the conduct was physically threatening or humiliating, and whether the behavior interferes with an employee's performance.  Harris, 510 U.S. at 23.

To succeed, the Plaintiff must show that "either a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment."  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal quotation marks omitted).  This standard is demanding, and requires proof that the conduct was offensive, pervasive and continuous.  See, e.g., Kotcher v. Rosa & Sullivan Appliance Ctr., 957 F.2d 59, 62-63 (2d Cir. 1992); Murphy v. Bd. of Educ. of the Rochester City. Such. Dist., 273 F. Supp.2d 292, 312 (W.D.N.Y. 2003) (holding that "difficult or stressful working conditions are not tantamount to a hostile work environment.").  While true that Daniels, an African-American female, is a member of a protected class, she does not satisfy the hostile work environment standard.

As a preliminary matter, in neither the Amended Complaint or in any complaint to the NYSDHR does Daniels allege any instances of abusive behavior or harassment by the Union or the individual "Union" Defendant.  In other words, there is nothing in these complaints to suggest that any of the Union Defendants contributed to the hostile work environment Plaintiff contends she endured while employed at HIP, thus summary judgment is granted as to these defendants.

Daniels claims that she was subjected to continuous harassment based on her race, national origin, and disability by HIP employees.  In order to survive summary judgment, Daniels must demonstrate a basis to hold HIP vicariously liable for the conduct that created the hostile environment.  See, e.g., Kotcher v. Rosa & Sullivan Appliance Center Inc., 957 F.2d 59, 63 (2d Cir. 1992).  Employer vicarious liability for a Title VII hostile work environment violation can be established if the individual responsible for the harassing conduct was (or is) the plaintiff's supervisor, with immediate authority over the employee.  Mack v. Otis Elevator Co., 326 F.3d 116, 125 (2d Cir. 2003).  That is the case here.

While employed as a secretary at HIP, Daniels developed medical problems that included two herniated discs as well as carpal tunnel syndrome, conditions that made it difficult for her file documents and write down messages.  Daniels Aff. ¶¶ 7-8.  Despite her disabilities,

Daniels alleges that her supervisors required her to file documents and assigned her a heavy workload, all of which contributed to an abusive work environment.  Id. ¶ 4.

Further, Daniels testified that she heard her supervisor, Jimenez, use a racial slur against her on two occasions.  The first incident she recounts was a conversation she overheard in the bathroom between Jimenez and Marta Cotto, a co-worker in the Marketing Department.  Daniels testified as follows:

> I was in the bathroom one day, and she [Jimenez] didn't know I was in there, with Marta Cotto; and she said, "Tell me if that nigger Merl doesn't answer the phone, Wes's phone."  They couldn't see me because it was like a --- they just couldn't see me.

Merl Daniels Deposition ("Daniels Dep.") at 154:3-8 (Dec. 14, 2005).  Daniels testified that this was not the first time that Jimenez had used that slur against her.

> Q:  Was that the first time you heard Yolanda use the "N" word?
>
> A:  She used it before, whenever she accused me of not answering the phone.  There was one day the phones were ringing and I was on a call, and Marta Cotto was standing there --  . . .  So she said it very low, very low, "That nigger didn't answer the phone?"  She didn't know I heard her. . . .  So she said, "That nigger Merl, that nigger didn't answer Wes's phone?"

Id.. at 155:3-21.  Jimenez denies ever using the term "nigger" to refer African-Americans or Daniels.  Jimenez Decl. ¶ 18.

While these incidents, if true, are doubtlessly insulting and inappropriate, this Circuit has held that sporadic incidents of this nature are not enough to constitute a hostile work environment.  In other words, "there must be 'more than a few isolated incidents of racial enmity,' meaning that '[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.'"  Schwapp v. Town of Avon, 118 F.3d 106, 110-11 (2d Cir. 1997) (internal citations omitted).  We do not have that level of racial commentary here.

While Daniels may have been subjected to unfair treatment, the record does not support her claim that HIP employees subjected her to the type of severe and offensive harassment necessary to satisfy the hostile work environment standard.  As a result, summary judgment is granted as to the remaining defendants on this claim.

*B. Title VII -- Race/National Origin Discrimination*

*1. Wrongful Termination*

Daniels alleges that she was terminated due to race and national origin discrimination and brings claims against both HIP and the Union Defendants.

*a. HIP*

To sustain a claim for wrongful termination, plaintiff must first establish a *prima facie* case of employment discrimination.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  To establish a *prima facie* case of discrimination against HIP, Daniels must show that she 1) is a member of a protected class, 2) was qualified for the position held, 3) suffered an adverse employment action, and 4) the surrounding circumstances gave rise to an inference of discrimination.  Id.  If the plaintiff sets forth a *prima facie* case, the burden of going forward shifts to the employer to "articulate some legitimate, non-discriminatory reason for the employer's rejection."  Id.  If the employer is able to do so, then the plaintiff must show that the stated reason is pretextual.  Id.

At this stage, Plaintiff has presented enough to establish a *prima facie* case.  Daniels, as an African-American woman, is a member of a protected class and clearly suffered an adverse employment action when she was fired on April 22, 2002.  See Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) (providing that an adverse employment action may include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.").  Further, although Defendants complain about Daniels' work product, they agree she was qualified to serve as a secretary in the Marketing Department.  The more difficult task for the Plaintiff is to tie her termination to discrimination on the basis of race and/or national origin.  Although slim at best, Daniels makes that showing.

During the time of the alleged harassment, Daniels was one of two African-American secretaries in the Marketing Department.  Jimenez Decl. ¶ 6.  The remaining five secretaries were of Hispanic origin.  Id.  Daniels reported to Jimenez, a Hispanic female.  Daniels alleges that she was harassed by, and eventually terminated, due to discriminatory animus on the part of Jimenez.  At her deposition, Daniels testified that Jimenez was biased against African-Americans.

> A: . . . Yolanda, she was just biased.  She always treated black people different.

> Q: Who else did she treat different?
>
> A: All the temps, all the black temps that would come in, she would lie, maybe [sic] up things on them, and report them to Artistine Terrell or Pat Coyle, who was her boss; and they would end up getting rid of the black secretaries, black temps. It was never anything good.

Daniels Dep. at 149:25-150:11. Further, Daniels stated that she overheard Jimenez refer to her as a "nigger" on two different occasions. Daniels Dep. at 154:3-8; Id. at 155:3-21. As a result of this bias, Daniels alleges that Jimenez harassed her, id. at 441:8-22, as well as demonstrated preferential treatment to her Hispanic co-workers, oftentimes giving her their work to complete.

> Q: Now, you said that you were discriminated against because you were black and Hispanic employees, in contrast to you being black, were being favored?
>
> A: They were.
>
> Q: Could you be a little specific as to what you mean by that and give some examples of that?
>
> A: They were given lighter loads – they were given – they were not given the type of workload that I had. They were not given the type of workload that I have. I was doing their work.
>
> Q: What were you doing? What was your workload?
>
> A: I was doing their typing that they didn't want to do, actually. I did Marta's typing or whatever work she did not want to do.
>
> Q: Is Marta Hispanic?
>
> A: Yes, she is.

Id. at 450:6-451:3. Daniels claims that Jimenez's bias led to her termination. This is enough to raise an inference of race and national origin discrimination with respect to her termination.

However, even with enough to establish a *prima facie* case, the claim must be dismissed because Daniels has failed to show that her termination was pretextual. HIP maintains and supports its contention that Daniels was an insubordinate employee, who continued her behavior after repeated warnings that further defiance would lead to additional disciplinary action, including possible discharge. To add insult to injury, Daniels apparently continued her ways and finally threatened to physically harm Jimenez. Two witnesses stated that Daniels made aggressive, hostile statements about Jimenez, which included stating that "If I can't get her

legally, I will get her illegally." McGuire Decl. ¶ 18.  After an investigation confirmed the veracity of this allegation (and revealed that Daniels has referred to owning a gun in the past), Daniels was terminated.  Id. ¶¶ 18-19.

Daniels does not submit any evidence that suggests that HIP's reasons for terminating her were pretextual, and thus, Daniels cannot sustain her wrongful termination claim.  As a result, summary judgment is granted on this claim as to HIP.

*b. Union Defendants*

To state a Title VII wrongful termination claim against a labor organization, the Plaintiff must demonstrate that the union 1) discriminated against her because of her race, color, religion, sex, or national origin, 2) segregated or limited its membership, or classified its membership or applicants for membership "in any way which would deprive or tend to deprive any individual of employment opportunities," or 3) caused or attempted to cause an employer to discriminate against an individual because of her race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(c)(1)-(3).  The burden-shifting framework of McDonnell Douglas Corp. v Green, 411 U.S. 792 (1973), set forth above applies.

The Plaintiff makes no allegation, either in her Amended Complaint, her numerous filings to the NYSDHR, or here, at the summary judgment stage, that any Union Defendant – Pagan, Local 153, or OPEIU – discriminated against her or caused HIP to discriminate against her.  In fact, Daniels testified at her deposition that the Union Defendants did not discriminate against her.

> Q:  But Ms. Pagan didn't discriminate against you, she just didn't do enough for you?
>
> A:  Well, the thing is, she knew what was going on.  She knew the – she knew what was going on with Yolanda.
>
> . . .
>
> Q:  But she [Pagan] didn't herself discriminate against you?
>
> A:  She didn't herself, but she did go along.  She didn't do anything about it.
>
> . . .
>
> Q:  I understand.  And just so that we're very clear, not only is the union not named in the caption, which is what that is (indicating), but there's nothing in the

> body of the complaint with either Ms. Pagan or [Local] 153 or any other individual associated with the union as named as having committed a discriminatory act against you, correct?
>
> A: Yeah. Like I – I mean, didn't type – like I said, I did not type this. This was typed by, I guess, the division of human rights. . . .

Daniels Dep. at 426:21-428:2. At best, Daniels raises a failure to represent, not a discrimination claim. As a result, summary judgment is also granted with respect to the Union Defendants.

*2. Failure to Promote*

Plaintiff also brings a failure to promote claim due to race and national origin discrimination against all Defendants. Putting aside the question as to whether Plaintiff can establish a *prima facie* case, Defendants argue that this claim is time-barred and I agree.

In order for a plaintiff to set forth an employment discrimination claim in federal court, the plaintiff must file a discrimination charge with the EEOC. In order for the claim to be timely under Title VII, the discrimination charge must be filed within 180 days of the alleged illegal employment action, or, in the case where the claimant has already filed a charge with a state or local agency, the charge must be filed with the EEOC within 300 days of the alleged discriminatory act. See 42 U.S.C. § 2000e-5(e)(1). These timeframes serve as a statute of limitations for Title VII cases. See, e.g., Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996). Since Daniels filed her complaint with the NYSDHR, a local agency, Daniels' failure to promote claim must stem from an activity that occurred within 300 days of her July 30, 2002 filing in district court, in other words, on or after October 4, 2001.

Plaintiff, by her own admission, applied for an upgrade (e.g. a promotion) in October 1998 by submitting a memo to her then-supervisor, Artistine Terrell. Daniels Dep. at 234:7-25; Id. at 408:21-23. Not only did Terrell aver that she never received the memo or any promotion request from the Plaintiff, Terrell Decl. ¶ 8, but the request, if it was made, and made according to Plaintiff's timetable, was made more than three years before she even filed a complaint with the NYSDHR or this court.[2] As a result, this claim is time-barred.

**C. ADA Claims**

Separate from her Title VII race and national origin discrimination claims, Daniels also

---

[2] Further, the Collective Bargaining Agreement, by which Plaintiff is bound, requires employees to request promotions through a bidding process, of which Daniels was aware and never initiated. Daniels Dep. at 410:8-412:14.

11

alleges two ADA claims: a) HIP failed to accommodate her disability and b) HIP terminated her employment because she was disabled.  Defendants respond that Daniels cannot demonstrate that she suffers from a disability within the meaning of the ADA, thus her disability discrimination claims must fail.

Title I of the ADA prohibits discrimination in the workplace against otherwise-qualified applicants with disabilities, or who become disabled.  Specifically, the statute prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, . . . and the other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The ADA statute defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C. §12102(2).  Daniels states that she suffers from the following disabilities – a herniated disc in her back, another in her neck, as well as bilateral carpal tunnel syndrome.  Daniels Dep. at  41:18-24.  She testified that her carpal tunnel syndrome has resulted in an inability to type with her right hand, and she only has limited typing ability with her left.  Id. at 24:22-25:4.  She is unable to drive a car.  Id. at 25:12-13.  She further testified that it takes longer for her to take a shower and get dressed in the morning.

> Q:  I am curious as to how your hand disability affects your day.  Can you tell me what you did when you woke up yesterday?
>
> A:  The norm.  I got up, took a shower, got dressed, and went out to where I had to go.
>
> Q:  And you were able to do all of that?
>
> A:  Yes, I was able to do that.  I can do some things, but it takes longer for me to do it.  I cannot—I have little or no strength in my right and left hands.  That prevents me from doing a job.

Id. at 25:18-26:6. Although she has undergone surgery on her right hand for her carpal tunnel, she reports that her condition has not improved to the extent where she can type on the computer.  Id. at 23:9-14.

With respect to the herniated disc (diagnosed in 1992), id. at 30:10-12, Daniels testified that at times she loses mobility in her right leg and cannot walk.  Id. at 50:23-51-6.  Further, when she sits down, she has muscle spasms in that leg and although she can climb stairs, it takes

some time to do so and two or three days later, her back will go out. Id. at 51:7-21. She admits that her condition has worsened since she left HIP in 2002, and she will never be able to work as a secretary again. Id. at 51:22-52:8.

Daniels has described limitations with respect to walking, sitting, climbing, working – major life activities as defined in the statute. See 29 C.F.R. § 1630.2(i) ("Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."). However, the limitations must be "substantial" to qualify as a disability under the ADA. 42 U.S.C. §12102(2)(A). Although not defined in the ADA, the Equal Employment Opportunity Commission ("EEOC") regulations[3] provide that "substantially limits" means "unable to perform a major life activity that the average person in the general population can perform" or "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity" as compared to an average person in the population. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). The EEOC directs that the nature and severity of the impairment should be considered, along with the expected duration of the limitation and any long-term impact as a result of the impairment. 29 C.F.R. § 1630.2(j)(2)(i)-(iii).

Given these considerations, I find that Daniels has raised a genuine issue of fact as to whether she is disabled within the ADA statute. As a result, I must now turn to Daniels' ADA claims that HIP failed to accommodate her disability and eventually terminated her due to her disability. These are two distinct claims under the ADA, one that deals with Plaintiff's conditions of employment while the other concerns the circumstances surrounding her termination, and will be addressed separately below.

*1. Wrongful Termination Based on Disability*

The ADA prohibits a discharge based on an individual's disability. Daniels alleges that HIP terminated her because she was disabled. This Circuit analyzes ADA discrimination claims under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006). Plaintiff must first establish a *prima facie* case of discrimination. See McDonnell, 411 U.S. at 802. If the plaintiff sets forth a *prima facie* case, the burden of going forward shifts to the employer to "articulate some legitimate, non-discriminatory reason for the employer's rejection." Id. If the

---

[3] The EEOC is charged with administering the statute.

13

employer is able to do so, then plaintiff must show that the stated reason is pretextual. Id.

In order to make out a *prima facie* case of discriminatory discharge under the ADA, a plaintiff must show that (1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation; and (4) she was fired because of her disability. See Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d Cir. 1998) (citations omitted). As a preliminary matter, it is undisputed that HIP is subject to the ADA and as stated above, Daniels has made the necessary showing that her disability falls within the meaning of the ADA. However, this claim must also fail.

Daniels concedes that she cannot perform secretarial duties as a result of the severity of her disability. Daniels Dep. at 140:23-141:9. Without which, she cannot set forth a *prima facie* case of wrongful termination based on her disability. Furthermore, even assuming that Daniels made out a *prima facie* case, she has failed to demonstrate that any discriminatory animus motivated her termination. In other words, her actions towards her supervisor, Jimenez, provided a reasonable basis to end her employment and there is nothing in the record to suggest that Daniels' termination was a pretext for her employer's discriminatory animus. For those reasons, summary judgment is granted as to this claim also.

*2. Plaintiff's Failure to Accommodate Claim under the ADA*

The ADA requires employers to take affirmative steps to accommodate disabled individuals. 42 U.S.C. § 12112(b)(5)(A). To establish a *prima facie* case of failure to accommodate an employee's disability, the Plaintiff must demonstrate "1) that [s]he is an individual who has a disability within the meaning of the statute, (2) that an employer covered by the statute had notice of [her] disability, (3) that with reasonable accommodation, [s]he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations." Stone v. City of Mount Vernon, 118 F.3d 92, 96-97 (2d Cir. 1997); See also Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 184 (2d Cir. 2006). If the employer can demonstrate that making a reasonable accommodation would cause undue hardship, then the employer will not be found to have violated the ADA. Id.

As stated above, the first prong of this four-part test has been satisfied – at this stage, Daniels has demonstrated that she has a disability within the meaning of the ADA. As to the second, I will accept Daniels' claim that she requested that HIP accommodate her disability

14

(albeit years after the onset of her disability).[4]  The third prong of the *prima facie* test however has not been satisfied.  To overcome this hurdle, there must be a showing that with an accommodation the Plaintiff can do her job and here, Plaintiff admits that she can no longer perform, and could not perform secretarial tasks due to her disability.  See, e.g., Shannon v. New York City Transit Auth., 332 F.3d 95, 100-02 (2d. Cir. 2003)(finding that color-blind driver could not set forth a *prima facie* case of disability discrimination under the ADA because color differentiation could properly be considered an essential function of the job).  Here, Daniels does not even contend that she is capable of performing the essential functions of the secretarial position even with an accommodation from HIP (which she also fails to identify).

Pursuant to the ADA, an employer's written job description indicates the essential functions of a job.  See 42 U.S.C. § 12111 ("For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.").  Plaintiff's job description consisted of typing correspondence, answering telephone calls, filing, and other administrative work as necessary.  Terrell Decl., Ex. 1.  As required by the third prong of the four-part test, Daniels must demonstrate that she could perform the essential functions of the job with an accommodation.  Rather than make this showing, she concedes otherwise.

Daniels testified at her deposition that while she was still employed by HIP her carpal tunnel syndrome had reached the point where she could no longer continue secretarial work.

> Q:  Why were you going to leave?
>
> A:  I had enough.  I was going to leave.  I was planning on leaving anyways.
>
> Q: You mean looking for a different secretarial position.
>
> A:  My hands got really bad, and I was in pain all the time.  There was no – they would not give me anything else to do, and I could not continue – I knew I would not be able to continue to work on that computer because my hands were swelling.

---

[4] The record suggests that all accommodations made for Daniels came at the behest of HIP employees. HIP's nurse recommended that Daniels order a wrist brace due to her carpal tunnel syndrome.  Daniels Dep. at 141:17-143:5.  And both of the Plaintiff's supervisors, Terrell and Jimenez, allowed Daniels to sort and leave documents at her desk, in lieu of filing, due to her back condition.  Terrell Decl. ¶ 9; See also Jimenez Decl.¶ 20.

Daniels Dep. at 140:23-141:9.  The Second Circuit held in Gilbert v. Frank that "'reasonable accommodation' does not mean elimination of any of the job's essential functions," 949 F.2d 637, 642 (2d Cir. 1991) (internal citation omitted), and the Plaintiff's testimony plainly admits that this was what happened to her and would continue to happen, for her to maintain her position at HIP.  As a result, she falls short of demonstrating a failure to accommodate and summary judgment will be granted as to this claim also.

### D. Remaining Claims Against Union Defendants

*1. Intentional Infliction of Emotional Distress*

Under New York State law, to state a claim for intentional infliction of emotional distress, the Plaintiff must satisfy the following elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Howell v. New York Post Co., 81 N.Y.2d 115, 122 (N.Y. 1993) (internal citation omitted).  In other words, the Plaintiff must demonstrate that "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Id.  This is a strict standard, and hard to satisfy.  Id.  Based on the record before me, Plaintiff has not done so here.

Daniels has not alleged that any of the Union Defendants discriminated or harassed her, or for that matter participated in any activity that could rise to the requisite level of outrageousness to sustain a claim.  Thus, summary judgment is granted.

*2. Failure to Represent Due to Race/National Origin/Disability Discrimination*

To establish a *prima facie* case, the plaintiff must show that: 1) the employer violated the collective bargaining agreement with respect to the plaintiff, 2) the union did not act to correct the violation, and thus breached their duty of fair representation, and 3) the union's failure to act was motivated by discrimination.  Carion v. Local 32B-32J, SEIU, 2005 U.S. Dist. Lexis 4417, *22 (S.D.N.Y. 2005) (internal citation omitted).  To demonstrate breach of duty, the plaintiff must show that the union's conduct was either arbitrary, invidiously discriminatory, or in bad faith and that the union's conduct caused her injuries.  This is a heavy burden to meet and the Plaintiff does not satisfy the burden here.

Plaintiff alleges that Local 153 breached its duty of fair representation because they failed to address the discrimination and harassment that she was subjected to at HIP, despite their

16

awareness of the problem.  It is undisputed that Daniels was a member of Local 153 and thus owed a duty of fair representation.  However, she has presented no evidence that demonstrates that Local 153 acted either arbitrarily, discriminatorily, or in bad faith in their representation of her.

In fact, the union responded to plaintiff's complaint, albeit not to Plaintiff's satisfaction. As she testified at her deposition, the gravamen of her complaint was as follows:

> Q:  So you never alleged that the union discriminated against you?
>
> A:  They didn't really – well, the thing is that they didn't try to do anything about the discrimination or harassment.  They didn't do their utmost.
>
> Q: They didn't do their utmost?
>
> A:  They didn't do what they could do.  They just really didn't.  They could have did [sic] more, because even with the other like – there was a couple of people that was – well, there was one person I know that was promoted, and the union – Mercedes, they wrote letters.  They wrote memos in order to – made calls in order to get this lady promoted.  So if you could do that with her, and this is the person that I trained, then you could speak up for me.  You could speak to management or however you work things out with management in order to get this promotion for me.  They did not.

Daniels Dep. 424:15-425:12.  Daniels clearly concedes that the Union Defendants did not discriminate against her.  Further, the duty of fair representation does not require member satisfaction with the union's representation at all times.  Thus, summary judgment must also be granted as to this claim.

*3. Section 1983*

Plaintiff also brings a Section 1983 claim against the Union Defendants.  To state a claim against an individual pursuant to 42 U.S.C. § 1983, a plaintiff must demonstrate that the defendants deprived him of his constitutional or statutory rights while acting "under color of state law."  Pitchell v. Callan, 13 F.3d 545, 547-48 (2d Cir. 1994).  Plaintiff cannot make out, nor does she even try to make out, the necessary preliminary showing that any of the Union Defendants – Local 153, OPIEU, and Pagan – were state actors or were acting "under color of state law."  Thus, this claim must fail and the motion is granted as to this cause of action also.

## IV.    CONCLUSION

For the reasons stated above, the motion for summary judgment is granted as to the

remaining defendants. The Title VII hostile work environment, wrongful termination, and failure to promote claims are dismissed against all Defendants. The ADA failure to accommodate and discriminatory discharge causes of action are dismissed against HIP. Last, the intentional infliction of emotional distress, failure to represent, and 42 U.S.C. § 1983 claims are dismissed as to the Union Defendants. This case will be removed from my February trial calendar and the Clerk of the Court is instructed to close this matter and remove it from my docket.

**IT IS SO ORDERED.**

**New York, New York**
**January 4, 2007**

_____
U.S.D.J.